## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THOMAS G. McWEENEY, | * | |
| 517 Bay Dale Ct. | * | |
| Arnold, MD 21012 | * | |
| and | * | Civil Action No. 12-1309 |
| CENTER FOR STRATEGIC MANAGEMENT | * | |
| 821 West Benfield Road, Suite 1 | * | |
| Severna Park, MD 21146 | * | |
| Plaintiffs | * | |
| | * | |
| v. | * | |
| | * | |
| FEDERAL BUREAU OF INVESTIGATION | * | |
| Defendant | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Plaintiffs, Thomas G. McWeeney (Dr. McWeeney) and Center for Strategic Management

(CSM), for their Complaint against Defendant, Federal Bureau of Investigation (FBI), respectfully

aver as follows:

### PARTIES

1.      Made plaintiff herein are:

   a.      Thomas G. McWeeney, a person of the age of majority, and a citizen of the State of

   Maryland, as well as the owner and Chief Executive Officer of plaintiff Center for

   Strategic Management.

   b.      Center for Strategic Management, a Maryland corporation, with its principal place

   of business at Severna Park, Maryland.

2.      Made defendant herein is the Federal Bureau of Investigation ("FBI"), an agency of the

United States Government with its headquarters located in the District of Columbia.

1

## THE NATURE OF THE ACTION

3.      Dr. McWeeney has spent his career serving the interests of the United States of America, as an employee of the Drug Enforcement Administration, and later as a consultant and contractor (through plaintiff CSM) to the DEA, FBI, Department of Defense, and more than 35 other federal and state agencies.   In this suit, Dr. McWeeney and CSM seek declaratory relief and damages for the enormous harm that Dr. McWeeney and CSM suffered at the hands of the FBI Security Division (the "FBI-SD").  Plaintiffs were harmed when the FBI-SD made what are now admitted to be false accusations against Dr. McWeeney; revoked Dr. McWeeney's access to the type of sensitive information he needed in his work; and then staged a raid on CSM that effectively put it out of business.  The FBI-SD further compounded that harm when it transmitted the false and misleading accusations to the Defense Industrial Security Clearance Office, or "DISCO" (the entity within the Defense Security Service ("DSS") responsible for administration of security clearances to government contractors, including CSM).  DISCO subsequently revoked Dr. McWeeney's Top Secret clearance and CSM's "Facility Clearance" based on the FBI-SD's notification, thereby broadly precluding any other national security or law enforcement agency from contracting with Dr. McWeeney or CSM.  Still further, the FBI-SD significantly increased the harm to Dr. McWeeney and CSM when it covered up its errors and misconduct by embarking on a sham "review and appeal" process that offered no meaningful "review" or "appeal"; that repeatedly and egregiously violated the procedures established to protect persons such as plaintiffs, as well as any concept of fundamental fairness and due process of law; and the end result of which was pre-determined to be an affirmance of the FBI-SD's wrongful conduct, no matter what.

4.      In his career, Dr. McWeeney has held security clearances and been granted access to the most sensitive information and programs, including access to "Top Secret", and "Sensitive

2

Compartmented Information", or "SCI", as well as unescorted and highly privileged access to the offices of, as well as access to, and the confidence of, numerous top-level officials in the FBI and other government agencies.  Until the events complained of herein, Dr. McWeeney (and/or his company, CSM) held valuable contracts to provide important services to the FBI, the Department of Defense, and other government agencies, and enjoyed both a spotless reputation, and substantial financial success from those efforts.

5.      However, in September 2008 the FBI-SD revoked Dr. McWeeney's access to SCI (the "September 2008 Revocation").  The alleged basis for that revocation was set forth in a letter dated September 15, 2008 (the "September 15, 2008 Revocation letter"), in which the FBI-SD wrongfully accused Dr. McWeeney of:

      a.      having admitted to leaking classified information to the press from an FBI Director's Report on counterterrorism;

      b.      lying about having been authorized by a Deputy Director of the FBI to make that alleged leak;

      c.      lying during a polygraph examination (on a date on which no polygraph examination even occurred); and

      d.      having repeatedly changed his story during the FBI-SD's investigation into those matters.

6.      The FBI-SD then conducted a "raid" on CSM's offices on or about September 30, 2008, during which they seized classified materials and information that CSM used to perform its contracts with the FBI, and also caused Dr. McWeeney to be flagged in the Defense Department's Joint Personnel Adjudication System, thereby effectively putting CSM out of business.

7.      Still further, the FBI-SD published the September 15, 2008 Revocation letter containing the

false accusations to DISCO, along with another document that made additional false accusations, including falsely suggesting that the FBI's actions arose out of a counterintelligence investigation, thereby further tarnishing Dr. McWeeney's and CSM's reputation in the intelligence/security/law enforcement community in which they worked.

8.      The false accusations, revocation, and raid caused Dr. McWeeney and CSM immediate and substantial losses.  The FBI already had approved an extension of an existing contract with CSM, to be signed on September 27, 2008, and take effect on October 1, 2008.  That contract extension was aborted by the revocation and raid on CSM.  Further, Dr. McWeeney and CSM's 47 employees and contractors were forced to stop work immediately on the existing contracts they had with the FBI and other federal agencies.

9.      Dr. McWeeney promptly notified the FBI-SD that the allegations in its September 15, 2008 Revocation letter were false, and that the false accusations were causing enormous and potentially irrevocable harm to Dr. McWeeney and CSM.  In September and October 2008, Dr. McWeeney requested that the FBI-SD rescind, or at least suspend the effect of the September 2008 Revocation, pending an opportunity for Dr. McWeeney and CSM to show that the accusations in the letter were not true.

10.     At that point, the FBI-SD should have corrected its errors, and protected Dr. McWeeney and CSM from further damages caused by the September 15, 2008 Revocation letter.  However, to do so would have required the FBI-SD to admit that it had badly mishandled the investigation that resulted in the September 15, 2008 Revocation letter, and could potentially have exposed the FBI-SD to responsibility for the substantial financial losses that Dr. McWeeney and CSM had already suffered, and were continuing to suffer.

11.     It is undisputed that months later, the FBI-SD did concede in writing that the principal

accusations of the September 15, 2008 Revocation letter were unfounded.  Specifically, the FBI-SD concluded there was:

    a.    no evidence that Dr. McWeeney had leaked any classified information to the media;

    b.    no evidence that Dr. McWeeney had claimed that the Deputy Director of the FBI had authorized any alleged leak;

    c.    no evidence that Dr. McWeeney had even taken a polygraph examination on the date mentioned in the September 15, 2008 Revocation letter, much less failed one on that date; and

    d.    no evidence that Dr. McWeeney had changed his story at any time during the investigation that led up to the September 15, 2008 Revocation letter.

12.    But even after it was forced to admit those errors in February 2009, the FBI-SD refused Dr. McWeeney's request that it withdraw the September 2008 Revocation, or even suspend the revocation pending further investigation.  The FBI-SD instead embarked on a lengthy campaign to cover-up its errors, through a sham "review and appeal" process that pretended to comply with the regulations adopted to protect persons whose security clearances have been revoked, but which repeatedly violated those same regulations, and made a mockery of any concept of due process or fairness.

13.    For example, the FBI-SD offered three different versions of the alleged bases for the September 2008 Revocation and the September 30, 2008 raid:

    a.    The September 15, 2008 Revocation letter stated one set of alleged bases for the revocation.

    b.    By February 2009, when the FBI-SD was forced to admit that the substantive accusations in the September 15, 2008 Revocation letter were unfounded, the FBI

simply announced that the revocation was actually based on a different set of alleged "facts", which (if they were considered at all) obviously were not deemed significant enough in September 2008 to be included as part of the bases for the September 2008 Revocation.

c.    Months later, after purporting to conduct another review of the alleged bases for the September 2008 Revocation, the FBI-SD attempted to re-write history yet again, producing a letter dated August 27, 2009, and announcing that the August 27, 2009 letter stated the *true* bases for the September 2008 Revocation, almost a year after the Revocation actually occurred.

14.    The FBI-SD also repeatedly refused to comply with the requirement in the applicable regulations that it must produce copies of the entire investigative file, and of all the documents on which the revocation allegedly was based, despite repeated requests by Dr. McWeeney for those documents.  The FBI-SD instead produced only parts of the file, and redacted copies of documents it claimed were too sensitive to reveal to Dr. McWeeney.

15.    Months later, however, when it made its submissions to the panel that would hear the final appeal from the September 2008 Revocation, the FBI-SD attached documents and/or to those submissions that it had previously refused to produce on grounds of national security, thereby proving that the prior refusals to produce those documents were in bad faith, and prejudicing Dr. McWeeney's appeal rights.

16.    The FBI-SD's submissions to the high-level appeal panel also attempted to resurrect allegations that had been specifically withdrawn more than two years earlier, thereby misleading the panel and further prejudicing Dr. McWeeney.

17.    The FBI-SD also violated the requirement that a majority of the members of the "high level

appeal panel" that would decide Dr. McWeeney's final appeal must be from "outside the security arena", and instead appointed a panel the majority of whom were actually employees of the FBI-SD.

18.     The FBI-SD also attempted to ambush Dr. McWeeney before the high-level appeal panel, by raising for the first time at the appeal hearing a wholly new false accusation, based on documents that had never been produced.  Although Dr. McWeeney submitted additional documents after the high level appeal panel hearing that demonstrated that these new eleventh hour accusations were also false, and that the FBI-SD had misrepresented the documents they offered, the ambush of Dr. McWeeney with wholly new material further demonstrates that the entire appeal was a sham, whose outcome was pre-determined before it even began.

19.     Not surprisingly in light of all the above, the pre-ordained result of the sham review and appeal procedures was to deny Dr. McWeeney's appeal, even though the November 7, 2011 ruling by the high-level appeal panel did not include any finding of any substantive violation by Dr. McWeeney of any law or FBI procedures.

20.     Having exhausted the sham administrative procedures the FBI-SD imposed in self-justification of its errors, Dr. McWeeney and CSM turn to this Court for redress.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the instant action pursuant to 28 U.S.C. § 1331, in that the plaintiffs' claims arise under the constitution and laws of the United States, including (without limitation) the Fifth Amendment to the United States Constitution, 5 U.S.C. §§ 552a and 706; and 28 U.S.C. §§ 1346 and 2671 *et seq*.

22.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1346, 1391 and/or 1402, because the headquarters of the FBI is located, and all or a substantial part of the actions or omissions complained occurred, in this District.

## JUSTICIABILITY

23.     Although it is anticipated that the FBI-SD will argue that this matter is not justiciable, because the Courts do not ordinarily review the merits of a security clearance decision, this action does present a justiciable dispute for at least two reasons: First, there is no dispute that the FBI-SD itself conceded in writing that the September 15, 2008 Revocation letter was riddled with false and misleading accusations.  Further, the only affirmative finding in the November 7, 2011 decision by the appeal panel affirming the revocation is that Dr. McWeeney allegedly failed polygraph examinations.  But an unsuccessful polygraph examination is not a substantive violation of any law or FBI regulation, and the FBI's own published policies declare that the FBI does not consider a failed polygraph examination a sufficient basis for adverse action against a person's security clearance.

24.     In other words, the Court does not have to review the merits of the September 2008 Revocation because the FBI-SD has already admitted in writing that the stated bases in the September 15, 2008 Revocation letter were unfounded and/or insufficient as a matter of established policy to justify the FBI-SD's actions.

25.     Further, no deference is required to any of the supposed "merits" of the sham review or appeal actions taken by the FBI-SD because those actions are and were so demonstrably inconsistent with the applicable statutes, Executive Orders and the regulations adopted by the Office of the Director of National Intelligence, and so inconsistent with fundamental principles of due process and fairness established in the United States Constitution, that it is obvious that the outcome of that process had been pre-ordained, and that there was no actual review or exercise of any reasonable discretion.

26.     Further, if the Court were to determine that the sham review and appeal process conducted

by the FBI-SD did not violate the regulations adopted by the Office of the Director of National Intelligence (which is denied), then plaintiffs' claim that the adoption of the procedures in question violated the United States Constitution, and/or the Administrative Procedures Act, further demonstrates a justiciable case or controversy.

27.     For all of those reasons, the allegations of this Complaint present a justiciable case or controversy within this Court's jurisdiction.

## FACTUAL ALLEGATIONS

### Dr. McWeeney and CSM Before the Revocation

28.     Under the auspices of CSM, Dr. McWeeney has been in the business of providing strategic management consulting services to United States government agencies, especially agencies in the law enforcement, intelligence and national security arenas, for over 20 years.  Dr. McWeeney has been providing those services specifically to the FBI's most senior executives since 1994.

29.     Dr. McWeeney has had a U.S. Government TOP SECRET clearance since 1976. Separately, and in response to urging by the FBI to ease their administrative burden, CSM requested and was issued a TOP SECRET facility clearance in 2005, which permitted CSM to facilitate the security clearances of all its employees, contractors, and affiliated staff working on classified projects for government agencies.   This essentially permitted CSM to maintain its own internal security program, working under the oversight of its national security clients and the Defense Security Service (DSS).  By 2008, CSM administered the security clearances for 47 employees and contractors through that facility clearance.

30.     In April 2006 the FBI granted Dr. McWeeney access to Sensitive Compartmented Information (SCI), as was deemed appropriate for the FBI projects that had been assigned to CSM.  Dr. McWeeney had been authorized SCI access periodically throughout his career, depending on

the sensitivity of the assigned project.   This authority was subsequently relied upon by Department

of Defense, Department of Homeland Security, Department of Energy, and various agencies within

the Department of Justice that from time to time requested the services of Dr. McWeeney and CSM.

31.     Dr. McWeeney received his Ph.D. (with distinction) in Government from Georgetown

University in 1982.  He is a political scientist, strategic planner and management consultant with

more than 35 years of experience in designing and facilitating the implementation of strategic

planning and strategic management systems for the Federal Government. Between 1974 and 1992,

Dr. McWeeney was employed by the Drug Enforcement Administration of the U.S. Department of

Justice, where he served in various positions including Manager of DEA's strategic planning,

budget, evaluation, and management analysis programs.

32.     As Program Director of Central Michigan University's Performance Management program,

Dr. McWeeney has conducted over 125 performance-related training seminars, attended by more

than 4,500 federal employees from over 75 different agencies.  He has also participated in training

activities for the U.S. House of Representatives, the Capitol Police, and dozens of federal agencies

and private organizations that have requested on-site training. He has worked closely with high-

ranking officials from Office of Management and Budget, Governmental Accountability Office,

Congressional Oversight Committees, National Academy of Public Administration, and others in

the public administration community of Washington, D.C. Dr. McWeeney has served for 15 years

as an Associate Graduate Faculty member with Central Michigan University, teaching graduate

courses in Public Policy, Strategic Planning, Program Evaluation, Budget and Finance,

Intergovernmental and International Relations, and Social Science Research Methods.   He is

currently an Adjunct Graduate Professor in Intelligence Management for the University of Maryland

University College.

10

33.     Dr. McWeeney and CSM have provided strategic management consulting services to more than 35 federal and state agencies. Since 1998, Dr. McWeeney has focused on directing major projects affecting the strategic direction, the operational performance, and management infrastructure on behalf of the Deputy Director, the Executive Assistant Director for Counterterrorism and Counterintelligence, the Assistant Director for Counterintelligence, and the Assistant Director for Intelligence of the FBI; the Director and Deputy Directors of the Naval Criminal Investigative Service; the National Counterintelligence Executive; the United States Attorneys from the Western District of Washington, the Eastern District of Missouri, and the Southern District of Illinois; the Administrator of the Drug Enforcement Administration; the Assistant Commissioner of the U.S. Customs Service; the Director of the Federal Law Enforcement Training Center; the Director of the Organized Crime Drug Enforcement Task Force Program in the Department of Justice; and the Director of Court Services and Offender Supervision Administration.

### The Erroneous Accusations and Revocation of SCI Access

34.     By letter dated September 15, 2008, the FBI-SD simultaneously advised Dr. McWeeney and the FBI executives he was working for at the time that Dr. McWeeney's continued access to SCI material was being revoked,  that all access to FBI facilities and information was being denied Dr. McWeeney and CSM, that all work was immediately being discontinued, that pending and approved contracts were being cancelled, and that CSM's records and property relevant to CSM's work for the FBI, were being seized.

35.     As part of the September 2008 Revocation the FBI terminated Dr. McWeeney's 14-year business relationship with the FBI by aborting the pre-approved renewal of a long-standing contract by CSM with the FBI Counterintelligence Division, which renewal would have become effective on October 1, 2008

36.     Shortly thereafter, the FBI-SD raided CSM's offices to remove classified material, seized CSM's computer equipment, and denied Dr. McWeeney and CSM all access to FBI facilities and information.

37.     At or about the same time, the FBI-SD also informed DISCO of its actions by forwarding both the September 15, 2008 Revocation letter, and a second memorandum with additional false allegations, and posted a security notice on the government-wide security system, thereby effectively shutting down CSM's business.

**Dr. McWeeney's Protests Trigger The Sham Review And Appeal Process**

38.     After being advised by Dr. McWeeney and his counsel that the revocation letter was fraught with inaccurate information, careless innuendo and unfounded allegations and that the investigative file did not support the alleged revocation grounds, the FBI embarked on a sham review and appeal process that only pretended to comply with the procedures and safeguards that were established to protect persons such as Dr. McWeeney.

39.     Pursuant to Executive Order No. 12968, the Office of the Director of National Intelligence issued Intelligence Community Policy Guidance statement ("ICPG") 704.3, entitled: "Denial or Revocation of Access To Sensitive Compartmented Information, Other Controlled Access Programs Information, and Appeals Processes."  Pursuant to ICPG 704.3, the FBI-SD was required to follow at least the following procedures, among others:

  a. Provide the clearance holder with a "comprehensive written explanation of the basis for the denial or revocation" of the SCI access.

  b. Notify the clearance holder of their right to counsel and their right to request any documents, records or reports on which the denial or revocation is based and to request the entire investigative file.

c.      Provide the clearance holder with an opportunity to respond within 45 days of receipt of the requested documents, and to request a management review of the denial or revocation.

d.      Provide the clearance holder with a written notice of the results of the review and the reasons for that result.

e.      Provide the clearance holder with an opportunity to appeal to a panel comprised of a majority of persons outside the security arena.

40.      In Dr. McWeeney's case, and as detailed below, the FBI-SD violated each and every one of the aforementioned requirements from ICPG 704.3, and violated some of them over and over.  The FBI-SD's repeated violations of ICPG 704.3 demonstrate that the review and appeal from the September 2008 Revocation was a sham, whose outcome was pre-ordained from the very start.

41.      It is undisputed that the ICPG 704.3 provides that the individual whose clearance has been revoked is entitled to request all documents on which the revocation was based, as well as the entire investigative file, and has 45 days after the production of those documents within which to request a management review of the revocation.

42.      Nevertheless, the September 15, 2008 Revocation letter flagrantly misrepresented the applicable regulations by failing to disclose the right to request the applicable documents, and by stating that any request for management review of the September 15, 2008 Revocation letter must be submitted within only thirty days from the date of that letter.

43.      Another, perhaps unintended acknowledgment that any review of the September 15, 2008 Revocation letter would be a sham, is contained in a letter from the FBI-SD's Assistant Director Roland Corvington to Dr. McWeeney on November 21, 2008, transmitting some of documents that Dr. McWeeney requested after receiving the September 15, 2008 Revocation letter.  The November

13

21, 2008 letter purported to correct the previously misstated procedures for review, and stated that Dr. McWeeney should submit his request for a review within 45 days from November 21, 2008, and that Dr. McWeeney would thereafter "be provided written notice of the results of the review, the identity of the deciding authority, *and your appeal rights.*"  Of course, Dr. McWeeney *would not have had* any appeal rights unless the review affirmed the September 2008 Revocation – a result that Mr. Corvington apparently knew from the very start.

44.     Most compellingly, the conduct of the FBI-SD after Dr. McWeeney demonstrated that the September 15, 2008 Revocation letter was riddled with errors, and statements not supported by even the limited investigative file documents that were produced, further demonstrated that the review process was a sham.

45.     In letters dated November 7, 2008 and February 3, 2009, the FBI-SD's Roland Corvington admitted that the principal alleged bases for the revocation stated in the September 15, 2008 Revocation letter were factually inaccurate and/or not supported by the documents in the partial investigative file that was produced to Dr. McWeeney by the FBI-SD.

46.     The February 3, 2009 letter had the effect of retracting the allegations of wrongful disclosures or allegedly false statements by Dr. McWeeney that were stated as the "comprehensive written explanation of the basis for the denial or revocation" required by ICPG 704.3.

47.     In essence, the FBI-SD was left with no remaining accusations that Dr. McWeeney had leaked classified material or lied about it, but maintained its revocation primarily on an assertion that Dr. McWeeney had not been able to successfully complete a polygraph examination about those admittedly false accusations.

48.     The FBI's own policies provide that an unsuccessful polygraph examination is not an act of misconduct, and not a sufficient basis for any adverse action against a person.  And as the Court is

well aware, evidence of a successful or unsuccessful polygraph examination ordinarily would not even be admissible in Court.

49.     Thus, the FBI-SD's admission in the February 3, 2009 letter left it with no allegations of substantive misconduct on which to defend the September 2008 Revocation, or the substantial harm it caused and continues to cause to Dr. McWeeney and CSM.

50.     Notwithstanding those stark admissions, the FBI-SD did not rescind the September 2008 Revocation, or even suspend the effect of the revocation pending further review or investigation. Instead, the FBI-SD announced, in the February 3, 2009 letter, that the September 2008 Revocation decision was actually made on a *different* set of bases, and not on the ones previously stated in the September 15, 2008 Revocation letter.

51.     That statement was itself a confession that the September 15, 2008 Revocation letter did not comply with ICPG 704.3, which requires that the person whose access has been revoked be given "a comprehensive written explanation of the bases for denial or revocation."

52.     Further, despite having recanted the false accusations in the September 15, 2008 Revocation letter that Dr. McWeeney had leaked classified information to the press and lied about it to the investigators, and despite having instead invented a new set of alleged bases for the FBI-SD's actions in September 2008, the FBI-SD proposed in the February 3, 2009 letter to skip straight to an appeal process.  The February 3, 2009 letter attempted to deny Dr. McWeeney any opportunity to obtain documents relevant to those new accusations, deny him any opportunity to respond to those new accusations, and deny him any opportunity to seek management review of his responses to those alleged bases.  That attempted omission once again demonstrates that the entire "review" process was a sham, and that the FBI-SD had no intention of entertaining any possible outcome other than affirmance of its prior, erroneous revocation.

15

53.    Further evidence that the entire review and appeal process was a sham is demonstrated by a letter dated June 30, 2009, from Mr. Edward Broussard, of the Office of the General Counsel of the FBI, which promised that the Office of the General Counsel would conduct a full review, not only of the challenged September 15, 2008 Revocation letter, but also of both the violations of proper investigative procedure in the investigation that led to the September 2008 revocation, and the violations of ICPG 704.3 during the purported review of the September 2008 Revocation.

54.    Despite the promise in the June 30, 2009 letter from Mr. Broussard that the investigation by the Office of the General Counsel would be completed shortly, Dr. McWeeney did not receive any substantive response from the FBI until a letter from the FBI-SD's Roland Corvington dated August 27, 2009, in which he stated that the FBI-SD had decided to "begin the revocation and appeals process anew", and thus the prior errors and false accusations, and the tainted investigative file that still contained them, were no longer relevant.

55.    Further, Dr. McWeeney did not receive the letter dated August 27, 2009 until November 9, 2009, and only then after multiple letters from his counsel to the FBI Office of General Counsel.

56.    Moreover, the letter dated August 27, 2009, was yet another *ex post facto* attempt to "massage the facts" sufficiently to retroactively create the appearance of a legitimate basis for the September 2008 Revocation, which the FBI-SD had by then effectively conceded was not supportable on the alleged bases set forth in the September 15, 2008 Revocation letter.

57.    The FBI-SD also showed that the entire review and appeal process was a sham in its November 8, 2010 letter stating the final results of the management review of the September 2008 Revocation.  In the November 8, 2010 letter, the FBI-SD did not discuss or address any of the prior errors or failings in the investigation, or in the September 15, 2008 Revocation letter.  Further, and in contravention of ICPG 704.3, the November 8, 2010 letter did not explain any of the reasons why

it apparently disregarded Dr. McWeeney's concerns and evidence.  Instead, the November 8, 2010 letter merely repeated the list of alleged bases as stated in the August 27, 2009 letter, and stated without elaboration that the showing made by Dr. McWeeney was "not sufficiently compelling to overturn the revocation determination."

58.     Pursuant to ICPG 704.3, Dr. McWeeney had a right to appeal to a "high-level panel which shall be comprised of at least three members, two of whom shall be selected from outside the security arena."   In further evidence that the appeal process was also a sham, the FBI-SD disregarded the requirement for an independent majority on the high-level appeal panel, and "packed the panel" with a majority of members of the FBI-SD – persons who were actually subordinates to the Assistant Director who signed the November 8, 2010 letter they were asked to review.

59.     The failure to maintain even the pretense of independence in the high-level appeal panel violates both the requirements of ICPG 704.3 and basic concepts of fairness and due process.

60.     The high-level appeal panel held hearings on the appeal on September 28, 2011 and October 24, 2011.   The FBI advised Dr. McWeeney that the appeal had been denied by letter dated November 7, 2011.   Differing from all previous correspondence on this matter, the November 7, 2011 letter conveying the final FBI decision contained no purported findings of any alleged wrongdoing by Dr. McWeeney, instead basing its decision solely on the unsuccessful polygraph results.

61.     It is a blatant violation of the FBI's own policy and practices to base a security clearance decision, or any other substantive action, solely on the basis of a polygraph examination.  (See U.S. Department of Justice, Office of the Inspector General, Report No. I-2006-008 "Use of Polygraph Examinations in the Department of Justice", at p. 44 ("FBI policy states that no adverse action will be taken based solely on the results of a polygraph examination").

62.     The unreliability of polygraph evidence is well documented.  It is inadmissible in Court, and both the FBI and the Department of Defense have adopted policies forbidding any adverse action against a clearance holder based solely on polygraph evidence.

63.     However, the FBI-SD nevertheless decided in 2006 to greatly expand the use of polygraph tests, and as part of that expansion Dr. McWeeney was given the initial polygraph test in January 2006.

64.     That initial polygraph test was originally interpreted to show no deception – a successful polygraph test.  However, at some time *after* the original polygraph interpretation, the FBI-SD decided as a matter of "quality control" to re-evaluate the results of the test as "inconclusive", and to require that Dr. McWeeney take another polygraph test.

65.     Despite repeated requests by Dr. McWeeney in the review and appeal process, the FBI-SD has adamantly refused to allow the actual polygraph readings from any of Dr. McWeeney's polygraph examinations to be reviewed by an independent polygraph examiner.

66.     The FBI-SD apparently takes the position that the findings of their polygraph examiners are infallible (except on those occasions when the FBI-SD decides to "correct" them as a matter of quality control), and that national security concerns preclude any independent review of the FBI-SD's polygraph results.

67.     It is impossible to know whether the knowledge that the FBI-SD was essentially accusing him of having lied in the initial polygraph examination played any part in the results of the subsequent examinations.  It is undeniable, however, that stress or anxiety can cause the types of physiological changes in pulse, respiration, etc., that the polygraph measures.

68.     But it is clear that throughout the sham review and appeal process, Dr. McWeeney was denied any opportunity to directly challenge the sole "fact" found by the high-level appeal panel in

its November 7, 2011 decision affirming the revocation – namely that Dr. McWeeney had failed polygraph examinations.

69.     Had the FBI-SD followed the same policy with Dr. McWeeney that it applies to its own personnel, the only finding affirmed by the high-level appeal panel would not have been a sufficient basis for the wide ranging harmful actions that were taken by the FBI in September 2008 against Dr. McWeeney and CSM.  The fact that the FBI-SD ignored its own policies to affirm the revocation is further evidence that the entire appeal process was a sham, in violation of Dr. McWeeney's rights under ICPG 704.3, and in violation of the Due Process clause of the Fifth Amendment to the United States Constitution.

**The FBI Showed In Other Ways That The "Review" Process Was A Sham**

70.     The bad faith of the FBI-SD during the sham review and appeals process is also demonstrated by the other acts by the FBI-SD that violated the requirements of ICPG 704.3.

71.     It is undisputed that a person whose security clearance is revoked has the right, pursuant to ICPG 704.3, to obtain copies of all documents on which the revocation was based, as well as the entire investigative file for the revocation.

72.     After receiving each of the constantly changing versions of the reasons for the September 2008 Revocation, Dr. McWeeney timely requested that the FBI-SD provide all the documents upon which they were based, as the FBI-SD was required to do pursuant to ICPG 704.3.

73.     Despite having offered three different versions of the alleged reasons for the September 2008 Revocation, the FBI-SD provided only two packages of documents to Dr. McWeeney in support of the ongoing revocation process, by letters dated November 21, 2008 and February 26, 2010.

74.     After receiving each of those productions, Dr. McWeeney advised the FBI-SD that the records provided were demonstrably incomplete, and requested additional records by at least nine

19

different letters, dated November 25, 2009, March 26, 2010, February 15, 2011, April 6, 2011, April 27, 2011, June 14, 2011, July 8, 2011, July 29, 2001, and August 12, 2011. The FBI-SD initially refused to provide additional records. After strongly asserting several times that no additional records existed that were subject to production pursuant to ICPG 704.3, the FBI-SD, nonetheless, later provided previously-undisclosed records and information at various transparently strategic times during the three-year revocation proceedings: by letter of March 25, 2011 (after all requests for management review had been completed); with the FBI-SD's Letterhead Memorandum to the high-level appeal panel in July 2011 (immediately prior to the appeal hearing); and by letter of November 2, 2011 (inexplicably after the appeal hearings had been completed).

75.     Moreover, the document production by the FBI-SD demonstrates in another way that the entire review and appeal process was a sham.

76.     By February 2010, the FBI-SD had pretended to consider the revocation decision on four separate occasions:

    a.     The FBI-SD had conducted its initial investigation, and made the initial decision reported in the September 15, 2008 Revocation letter.

    b.     The FBI-SD had conducted the "management review" reflected in the February 3, 2009 letter, which withdrew the false accusations in the September 15, 2008 Revocation letter that Dr. McWeeney had leaked classified information to the media, and lied to the investigators, but which also purported to state a new version of the "reasons" for the September 2008 Revocation.

    c.     The FBI Office of the General Counsel had purported to conduct an in-depth review of the entire matter in the summer of 2009. (However, the purportedly "independent" review by the Office of the General Counsel actually was conducted

by the same attorney who had reviewed and approved the false and misleading accusations in the September 15, 2008 Revocation letter, and he obviously had a strong personal interest in assuring that the September 2008 Revocation was upheld on some grounds.)

d. The FBI-SD's Roland Corvington also had purported to "begin the revocation and appeals process anew" with the letter dated August 27, 2009 (the third attempt to state the "reasons" for the September 2008 Revocation).

77. Yet the FBI-SD's document production in February 2010 did not include a single substantive document dated after September 15, 2008 (except for the letters reciting the successive versions of the basis for the revocation).

78. The failure to produce a single document created during the three purported "reviews" of the September 2008 Revocation that the FBI pretended to conduct between September 2008 and August 2009 proves that those reviews were a sham. Perhaps the entire "reviews" were a sham because they were so insubstantial that *they did not generate a single substantive document*. Perhaps the reviews were a sham because the FBI-SD never intended to comply with its undeniable obligation under ICPG 704.3 to produce all documents reflecting those alleged reviews, in order to allow Dr. McWeeney a fair opportunity to respond to them. But in either event, the indisputable facts demonstrate that the review process and/or the document production process was a sham.

79. Dr. McWeeney also filed a Freedom of Information Act request to obtain access to certain specific records relating to the reviews. Amazingly, by letter dated February 24, 2012, Dr. McWeeney was advised by the FBI's Freedom of Information Officer that the documents responsive to this request – including some classified documents whose whereabouts should have been strictly controlled – inexplicably "*could not be located.*" The FBI did not attempt to offer any benign

21

explanation for the disappearance of those documents.

80.     Moreover, even while the FBI-SD was defending the decision to revoke Dr. McWeeney's access, and shut-down CSM's performance of its contracts with the FBI and other government agencies, the FBI apparently realized that the original decision to broadly deny Dr. McWeeney access to FBI facilities, projects and contracts was improper and should be reversed.

81.     In 2009, the FBI partially reinstated Dr. McWeeney's security access, and later issued him contracts in high priority and high visibility programs in the national security arena, even while the revised allegations were pending in the sham review.  The new access and the new contracts for the Assistant Directors in the National Security Branch resumed the identical work that was ongoing prior to the September 2008 Revocation, although at a far lower scope and value.

82.     The FBI-SD also returned to CSM in 2009 the documents and information it had seized in the raid in September 2008.  (However, although the FBI-SD seized a total of ten boxes of classified information in 2008, it returned only nine boxes in 2009, and claimed it could not locate the missing box of classified information.)

83.     The partial reinstatement of access and contracts in 2009 belied any continuing FBI-SD concern with Dr. McWeeney's loyalty, credibility, judgment, and ability or desire to properly handle classified information, and demonstrates the bad faith of any contrary assertions by the FBI-SD during the sham review process.

84.     That the FBI-SD was conducting the review and appeals process in bad faith is further demonstrated by the FBI-SD's failure to mention the reinstatement of the contracts anywhere in the so-called "Letterhead Memorandum" that it sent to the high-level appeal panel as part of the appeal process.  This is particularly telling in light of the applicability, pursuant to ICPG 704.3, of the so-called "whole person" concept, pursuant to which a reviewing body is to consider not only the

22

allegedly adverse information about the person, but also the favorable and mitigating factors, as well.

85.    The FBI-SD's bad faith is also demonstrated by its publication of information to other federal agencies.  The FBI-SD was quick to publish the erroneous accusations in the September 15, 2008 Revocation letter to DISCO, and transmitted that letter with another document that made additional unfounded accusations against Dr. McWeeney.

86.    Yet in February 2009, when the FBI-SD retracted the most damaging allegations in the September 15, 2008 Revocation letter because they were unfounded, the FBI-SD failed to inform DISCO of that retraction, and did not do so until late in 2010 when Dr. McWeeney specifically demanded in writing that they do so.

87.    Even after an express request from Dr. McWeeney (and upon information and belief, to this day), the FBI has refused to advise DISCO that the FBI admittedly had reinstated Dr. McWeeney's access in 2009 and had issued Dr. McWeeney additional contracts in 2009 even while the revocation proceeding was pending.  The FBI-SD's motive for refusing to disclose those undisputed and clearly relevant facts to DISCO remains unclear.

88.    In the November 7, 2011 letter announcing the results of the appeal to Dr. McWeeney, the FBI explained that it relied primarily, if not exclusively, on the results of the polygraph examinations of Dr. McWeeney.

89.    On information and belief, the FBI recognizes that polygraph results are unreliable. FBI policy and procedure thus require the FBI (i) not to revoke a clearance based on polygraph results alone, and (ii) to corroborate any adverse polygraph results through a corresponding investigation of the circumstances in question. *See* U.S. Department of Justice, Office of the Inspector General, Report No. I-2006-008 "Use of Polygraph Examinations in the Department of Justice", at p. 44

("FBI policy states that no adverse action will be taken based solely on the results of a polygraph examination.") That FBI Policy is consistent with the corresponding policy of the Department of Defense, which likewise precludes adverse action based solely on unsuccessful polygraph results. *See* Department of Defense Directive 5210.91, at Sec. 2g, p.10 (forbidding adverse administrative or personnel action on the basis of a failed polygraph examination).

90.　　The record of the sham review demonstrates that the FBI-SD first published the September 15, 2008 Revocation Letter as the alleged basis for the September 2008 Revocation, but that it was forced to retract that letter, and that even after two more attempts to state reasons that might justify its actions, the high-level appeal panel (the majority of whom are employees of FBI-SD) could not make a finding that *any* of the accusations against Dr. McWeeney were true, except that he had not passed a polygraph examination.

91.　　The United States Constitution, applicable statutes, including 50 U.S.C. §§ 435 *et seq.*, Executive Order 12968 and ICPG 704.3, require the FBI to provide Dr. McWeeney certain minimum procedural guarantees in the revocation process. The FBI failed to properly meet those requirements in at least the following ways (among others):

　　a.　　The FBI-SD failed to pursue the revocation process prescribed by its own procedures as described above.

　　b.　　The FBI-SD pursued a revocation process where Dr. McWeeney's requests for management review would be considered by the same person that signed the revocation letter (the head of the FBI-SD), thus denying any sort of independent review of the actions by the FBI-SD staff.

　　c.　　The FBI-SD refused to provide Dr. McWeeney a description of the procedures to be followed at the appeal hearing until 48 hours before the first appeal hearing.

24

d.    The FBI-SD improperly changed the appeal process for the benefit of the FBI-SD as the appeal proceeded by, among other things, deciding only 48 hours before the first appeal hearing to deny Dr. McWeeney the opportunity to present witnesses at the high-level appeal panel hearings, and by making that decision only after requesting and learning from Dr. McWeeney that the proposed witnesses were high-level former executives with the FBI and other government agencies, who had years of experience working with Dr. McWeeney, and were prepared to testify to his reliability, character and his many contributions to the national security efforts of their agencies.

e.    The FBI-SD refused to provide Dr. McWeeney any commitment that there would not be ex parte communications between the high-level appeal panel designated to hear the appeal and counsel for the FBI-SD.

f.    The FBI-SD refused to provide Dr. McWeeney any commitment to provide to the high-level appeal panel the record of the revocation proceeding so the panel members could refer to the record as necessary.

g.    The counsel assigned by the Office of General Counsel to advise the FBI-SD acted as both counsel to the FBI-SD and counsel to the high-level appeal panel, thus assuring that counsel for the prosecuting arm also was counsel to the high-level appeal panel hearing the appeal.

h.    The FBI-SD established an appeal panel that included three of five members from the FBI-SD itself, thus assuring control of the outcome by the FBI-SD.

i.    Upon information and belief, counsel for the FBI-SD (and for the high-level appeal panel at the same time) actually communicated with the high-level appeal panel

outside the designated hearing times, and likely during the deliberations themselves.

j.      Counsel for the FBI-SD (and the high-level appeal panel) committed that Dr. McWeeney could provide witness statements to the panel after the hearing, but, upon information and belief, the panel completed deliberations before receipt of the witness statements, and, when Dr. McWeeney provided witness statements within 24 hours of the hearing, refused to acknowledge receipt of those statements or that they would be provided to the high-level appeal panel.

### Damages

92.    Prior to the September 2008 Revocation and the raid on its offices, CSM was a vibrant and growing company, enjoying substantial success in the intelligence, law enforcement, and national security arenas in which it has specialized.  After the September 2008 Revocation and raid, and sham review and appeal process by the FBI-SD, the Company has suffered tremendous losses, and is essentially unable to operate at all.

93.    As stated above, the FBI-SD transmitted the false and misleading September 15, 2008 Revocation letter to DISCO, along with an additional memorandum making additional false and misleading accusations, including suggesting that the FBI-SD's September 2008 Revocation had arisen out of a counter-intelligence investigation.  In fact, the opposite was true, in that the FBI-SD had requested a counter-intelligence investigation of Dr. McWeeney following his initial polygraph examination, which investigation found *no evidence of any wrongdoing by Dr. McWeeney*.

94.    Further, the FBI-SD failed or refused to correct the false and misleading accusations transmitted to DISCO in September 2008 when the FBI-SD withdrew those accusations in February 2009, and failed or refused to communicate that withdrawal until more than a year later, in July 2010, and even then only after express written demand from plaintiffs.

95.     Even then, the FBI-SD refused in July 2010 to acknowledge or inform DISCO that the FBI had entered into new contracts with CSM and Dr. McWeeney in 2009 (which would have demonstrated to DISCO that the FBI did not consider Dr. McWeeney or CSM to be a security risk).

96.     By letters dated May 25, 2010 (at a time when the FBI-SD still had not informed DISCO that it had withdrawn the allegations in the September 15, 2008 Revocation letter), DISCO notified Dr. McWeeney and CSM that their respective TOP SECRET clearances had been suspended.  Those letters specifically stated that "This suspension is based upon a notification provided to the Defense Security Service (DSS) of a decision by another government agency to revoke your access to Sensitive Compartmented Information."

97.     Even though Dr. McWeeney attempted to notify DISCO of the withdrawal of the allegations in the September 15, 2008 Revocation letter that had been sent to DISCO, and of the other errors and violations of required procedure by the FBI-SD, DISCO took the position in letters dated January 20, 2011, February 16, 2011, February 18, 2011, and March 12, 2011, that it was required to suspend Dr. McWeeney's and CSM's clearances because of the FBI-SD's actions.  In the March 12, 2011 letter, DISCO specifically stated that it "did not, in fact, have the discretion to continue your clearance.  Certain information regarding the matter was provided to DSS and we were clearly compelled to conduct the suspension action in accordance with the provisions of the DOD Directive 5220.6, Paragraph 6.4."

98.     Upon information and belief, the FBI-SD has further asserted orally to other government agencies that CSM and/or Dr. MCWeeney are undesirable contractors.

99.     Because of the FBI-SD's immediate dissemination of the false accusations in the September 15, 2008 Revocation letter, and the FBI-SD's failure or refusal to timely correct those accusations even after it had conceded they were unfounded, CSM and Dr. McWeeney have been stigmatized

27

by the FBI-SD's actions as security risks, and that stigma has damaged both Dr. McWeeney's and CSM's business reputations, and has impaired Dr. McWeeney's liberty interest in the pursuit of his career of service to his country.

100.     Because DISCO is the organization responsible for management of security clearances and related access issues for contractors working within the Intelligence Community and the various law enforcement agencies of the United States government, and further because DISCO relies upon the FBI-SD and takes the position that it is prohibited from making any separate investigation of the security clearances of any contractor, the adverse action by the FBI-SD and its immediate publication to DISCO had the effect of broadly precluding Dr. McWeeney from pursuing his chosen career within those communities.

101.     In the five years that preceded the September 2008 Revocation and raid, CSM had experienced steady growth in its revenues, which rose during that period from approximately $2.9 million to approximately $4.8 million, annually.

102.     In the two years after the September 2008 Revocation, the revenues dropped dramatically, to approximately $1.5 million annually.

103.     After DISCO suspended, and eventually cancelled Dr. McWeeney's and CSM's TOP SECRET clearance – which DISCO has made clear was the result of the false and misleading accusations by the FBI-SD – it was essentially impossible for either Dr. McWeeney or CSM to obtain any new work in the intelligence, law enforcement and national security arenas, and revenues have plunged even further.

104.     The actions of the FBI-SD damaged CSM's property interest in the contracts it held with various government agencies.

105.     The actions of the FBI-SD likewise damaged Dr. McWeeney's property interest in his

28

ownership of CSM.  Prior to the September 2008 Revocation and the raid on CSM's offices, Dr.

McWeeney had turned down an offer to purchase CSM for $7.5 million, because the growth in the

company's business gave every reason to believe it would have even greater value in the future.

Today, it is unlikely that any purchaser could be found for the company until the wrongful

September 2008 Revocation is annulled.  Even then, Dr. McWeeney will have to spend years to

rebuild the company.

106.    Because of the wrongful conduct of the FBI-SD, Dr. McWeeney and CSM have suffered

damages, in an amount to be proven at trial herein, including at least the following:

      a.      Lost profits to CSM from the contracts that CSM was performing in September

2008, but which were terminated by reason of the FBI-SD's September 2008

Revocation and the raid on CSM's offices.

      b.      Lost profits to CSM from the pre-approved contract renewal that was to have been

effective starting October 1, 2008, the execution of which was canceled by reason

of the FBI-SD's September 2008 Revocation and the raid on CSM's offices.

      c.      Lost future profits on contracts or work that CSM would have been able to obtain in

the future but for the FBI-SD's September 2008 Revocation, and the raid on CSM's

offices, and but for the FBI-SD's transmittal of false and misleading accusations to

DISCO, and its failure and refusal to fully correct the misinformation and mistaken

impression it created by those communications.

      d.      Lost salary and other compensation to Dr. McWeeney by reason of the lost revenues

and lost contracts to CSM that were cancelled or terminated by reason of the FBI-

SD's September 2008 Revocation, and the raid on CSM's offices, and/or the

contracts that CSM would have been able to obtain in the future but for the FBI-SD's

transmittal of false and misleading accusations to DISCO, and its failure and refusal to fully correct the misinformation and mistaken impression it created by those communications.

e.      Loss to Dr. McWeeney of the value of his ownership interest in CSM by reason of the FBI-SD's September 2008 Revocation, and the raid on CSM's offices, and the FBI-SD's transmittal of false and misleading accusations to DISCO, and its failure and refusal to fully correct the misinformation and mistaken impression it created by those communications.

f.      Any other losses that may be proven at trial.

## COUNT ONE

### (Fifth Amendment Deprivation of Liberty Interest)

107.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 106 of this Complaint as if fully restated herein.

108.    Dr. McWeeney has a constitutionally protected liberty interest in the continued pursuit of his lifelong career in public service in the law enforcement, intelligence, and security arenas.

109.    Until the events complained of, Dr. McWeeney had an unblemished reputation and highly successful career in those arenas.

110.    As a result of the erroneous September 2008 revocation, the raid on CSM, the publication of the false and injurious accusations to other federal agencies and others within the tight-knit communities involved in law enforcement, intelligence, and security, and the failure or refusal to correct those false and misleading accusations when they were later withdrawn (despite requests from plaintiffs), Dr. McWeeney has been stigmatized with the characterization of being an undesirable vendor, and a security risk.

30

111.    By pretending to afford Dr. McWeeney an administrative review process (but instead conducting only a sham proceeding, contrary to applicable procedures, and devoid of fairness or due process of law) the FBI-SD has heightened the appearance of stigma that affects both Dr. McWeeney and CSM.

112.    The actions and inactions of the FBI-SD have resulted in a change in status of Dr. McWeeney by broadly precluding him from any future contracts within the law enforcement, intelligence and security communities in which he has made his career over the last 35 years.

113.    The stigma and disqualification that have resulted from the erroneous September 2008 revocation, the raid, and the FBI's sham "review" of those actions have adversely affected Dr. McWeeney's liberty interest in the pursuit of his career.

114.    Since the conduct complained of, Dr. McWeeney has faced great difficulty obtaining the type and volume of work that he previously was able to obtain as a consultant in his chosen field, and has suffered substantial financial losses because of the inability to find such work.

115.    Dr. McWeeney has also suffered substantial non-pecuniary damages from being denied the opportunity to serve his country to the best of his ability at a time when his country is involved in a war on terrorism, both abroad and within the United States.

116.    The September 2008 Revocation and the sham review and appeal process conducted by the FBI-SD failed to conform with the requirements of the applicable statutory and administrative law, including (without limitation) Executive Order No. 12698, and Intelligence Community Policy Guideline 704.2 and/or 704.3, all in violation of Dr. McWeeney's right to due process in any impairment of his liberty or property interests, pursuant to the Fifth Amendment to the United States Constitution.

117.    Those violations caused Dr. McWeeney damages, as aforesaid.

31

118.    Accordingly, Dr. McWeeney is entitled to and demands judgment in his favor and against the FBI, declaring the September 2008 Revocation (including the September 15, 2008 Revocation letter and all of its subsequent reiterations) to be null and void, and awarding plaintiff damages in an amount to be determined by this Court.

119.    Cumulatively and alternatively, to the extent that the FBI-SD is deemed to have complied with the procedures established pursuant to Executive Order 12698 and ICPG 704.3 (which is denied), then those procedures violate Dr. McWeeney's right to due process in any impairment of his liberty or property interests, pursuant to the Fifth Amendment to the United States Constitution.

120.    Those violations caused Dr. McWeeney damages, as aforesaid.

121.    Accordingly, Dr. McWeeney is entitled to and demands judgment in his favor and against the FBI, declaring ICPG 704.2 and 704.3 to be unconstitutional, and awarding plaintiff damages in an amount to be determined by this Court.

## COUNT TWO

### (Fifth Amendment - Deprivation of Property Interest)

122.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 121 of this Complaint as if fully restated herein.

123.    At the time of the September 2008 Revocation, CSM had a constitutionally protected property interest in its until then unblemished business reputation, and in several contracts it then held and/or had been approved to receive from the FBI, and/or any other government agencies.

124.    In addition, at the time of the September 2008 Revocation, Dr. McWeeney had a constitutionally protected property interest in his own business reputation, in the ownership of CSM, and in any contracts for personal services he held and/or had been approved to receive from the FBI and/or any other government agencies.

32

125.     By making the September 2008 Revocation without any legitimate basis, by publishing the

false and misleading accusations against plaintiffs to other federal agencies and by failing or

refusing to correct those false and misleading accusations when they were later withdrawn (despite

requests from plaintiffs), and by conducting the September 2008 raid on the offices of CSM, the

FBI-SD impaired plaintiffs' property interest in their respective business reputations, their respective

property interests in the contracts plaintiffs held and/or would have held with various governmental

agencies, and Dr. McWeeney's ownership interest in CSM.

126.     By pretending to afford plaintiffs an administrative review process (but instead conducting

only a sham proceeding, contrary to applicable procedures, and devoid of fairness or due process

of law) the FBI-SD has heightened the adverse impact of the September 1008 Revocation and the

raid on the property interests of both Dr. McWeeney and CSM.

127.     Since the events complained of herein, plaintiffs have faced great difficulty obtaining the

type and volume of work that they were previously able to obtain as consultants in their chosen field,

and have suffered substantial financial losses because of the inability to find such work.

128.     Because of the loss of the contracts terminated by the FBI-SD, CSM has also lost the

services of numerous valued employees and/or contractors whose services could have provided

additional sources of revenues and profits to CSM.

129.     The September 2008 Revocation and the sham review and appeal process conducted by the

FBI-SD failed to conform with the requirements of the applicable statutory and administrative law,

including (without limitation) Executive Order No. 12698, and Intelligence Community Policy

Guideline 704.3.

130.     Those violations caused plaintiffs damages, as aforesaid.

131.     Accordingly, plaintiffs are entitled to and demand judgment in their favor and against

defendant, the FBI, declaring the September 2008 Revocation (including the September 15, 2008 Revocation letter and all of its subsequent reiterations) to be null and void, and awarding plaintiffs damages, in an amount to be determined by this Court.

132.    Cumulatively and alternatively, to the extent that the FBI-SD is deemed to have complied with the procedures established pursuant to Executive Order 12698 and ICPG 704.3 (which is denied), then those procedures violate the United States Constitution, and its protections against the impairment of life, liberty or property without due process of law.

133.    Those violations caused plaintiffs damages, as aforesaid.

134.    Accordingly, plaintiffs are entitled to and demand judgment in their favor and against defendant, the FBI, declaring ICPG 704.2 and 704.3 to be unconstitutional, and awarding plaintiffs damages, in an amount to be determined by this Court.

## COUNT THREE

### (Privacy Act)

135.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 134 of this Complaint as if fully restated herein.

136.    The FBI-SD developed and created an extensive investigative file on Dr. McWeeney and/or CSM concerning the September 2008 Revocation and concerning the sham review and appeal process.

137.    Pursuant to applicable law, including (without limitation) 5 U.S.C. § 552a, the FBI-SD had a duty to maintain all files and records concerning Dr. McWeeney and CSM with such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in any determination made pursuant to that file.

138.    Pursuant to applicable law, including (without limitation) 5 U.S.C. § 552a, the FBI-SD had

a further duty not to release the investigative file, or any portion thereof, without making reasonable efforts to ensure the accuracy and completeness thereof.

139.    The FBI-SD failed or refused to comply with the aforementioned duties when it released all or parts of its investigative file (or the results thereof) to DISCO, and/or to other governmental agencies.

140.    The FBI-SD violated the aforementioned duties by failing to ensure the accuracy of the investigative file for Dr. McWeeney and/or CSM, and/or by releasing the September 15, 2008 Revocation letter (which was part of the FBI-SD's records) to DISCO and/or to other governmental agencies, and/or by failing to correct the information provided to DISCO and/or to other governmental agencies, after the FBI-SD acknowledged in writing the inaccuracy of the September 15, 2008 Revocation letter and/or other documents in its files.

141.    The aforementioned actions and omissions of the FBI-SD were not undertaken in the performance of any law enforcement function, in that the FBI-SD did not undertake, and DISCO could not undertake, any law enforcement action in the revocation of Dr. McWeeney's and/or CSM's security clearances.

142.    The aforementioned violations caused plaintiffs damages, as aforesaid.

143.    Pursuant to applicable law, including (without limitation) 5 USC §552a(g)(1)(C), plaintiffs are entitled to and demand a judgment in their favor compelling the FBI-SD to correct the inaccurate information maintained in its files concerning plaintiffs, and provide notice of that correction to DISCO and to any other governmental agency to which the said inaccurate information was disclosed, and awarding plaintiffs damages caused by the said violations in an amount to be determined by this Honorable Court, as well as their reasonable costs (including attorneys fees) incurred in connection with this action.

## COUNT FOUR

### (Administrative Procedure Act)

144.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 143 of this Complaint as if fully restated herein.

145.    The 2008 Revocation (including the September 15, 2008 Revocation letter and all its subsequent reiterations) and the sham review and appeal process (including the November 7, 2011 letter ruling by the high-level appeal panel) constituted agency actions, within the meaning of the Administrative Procedures Act.

146.    In making the September 2008 Revocation (including the September 15, 2008 Revocation letter and all its subsequent reiterations) and in conducting the review and appeal process from that September 2008 Revocation, the FBI-SD was at all times required to comply with the applicable law, including (without limitation) 50 U.S.C. § 435 *et seq*., Executive Order No. 12968, and ICPG 704.2 and 704.3.

147.    Pursuant to applicable law, including (without limitation) 5 U.S.C. § 706, this Court has the power to "hold unlawful and set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law. . . ."

148.    The complained of acts and omissions of the FBI-SD in making the September 2008 Revocation and conducting the sham review and appeal process were arbitrary and capricious, in at least the following respects:

        a.    The September 2008 Revocation was expressly based on alleged factual assertions

36

in the September 15, 2008 Revocation letter that were false and misleading, unsupported by the evidence in the investigatory record, and which were ultimately withdrawn in writing by the FBI-SD in February 2009.

b.     In making the September 2008 Revocation and conducting the sham review and appeal process, the FBI-SD failed to consider all of the factors mandated pursuant to the applicable law, including (without limitation) ICPG 704.2 and/or 704.3.

c.     In making the September 2008 Revocation and in conducting the sham review and appeal process, the actions of the FBI-SD were inconsistent with the statutory mandate, and frustrate the underlying policy of providing fair and consistent substantive and procedural rights to all persons whose security clearance or access rights are revoked, as set forth in 50 U.S.C. § 435, and the Executive Orders and regulations adopted in compliance with the mandate therein, including (without limitation) Executive Order 12968 and ICPG 704.2 and 704.3.

149.    The September 2008 Revocation and the November 7, 2011 ruling of the high-level appeal panel also constitute an abuse of discretion by the FBI-SD, in that the FBI-SD made the September 2008 Revocation, and the high-level appeal panel affirmed that revocation on the sole finding that was affirmatively stated in the November 7, 2011 ruling of the high-level appeal panel – the inability to successfully complete a polygraph examination – in violation of the FBI's established policy to the effect that an unsuccessful polygraph examination is not a sufficient basis upon which to take adverse action against an employee or clearance holder.

150.    Further, the both the September 2008 Revocation and the sham review and appeal process are independently unlawful, and in violation of the Administrative Procedure Act, because they were made without observance of the procedures required by law, including (without limitation) ICPG

37

704.2 and 704.3.

151.    Plaintiffs have suffered a legal wrong and/or are aggrieved by the 2008 Revocation, and by the sham review and appeal process conducted by the FBI-SD.

152.    Accordingly, plaintiffs are entitled to and demand that the Court enter an order declaring the September 2008 Revocation (including the September 15, 2008 Revocation letter and all its subsequent reiterations), and the sham review and appeal process and the November 7, 2011 ruling of the high-level appeal panel, to be unlawful, and setting the said agency actions aside.

153.    Cumulatively and alternatively, to the extent (if any) that the conduct of the FBI-SD in connection with the September 2008 Revocation and the sham review and appeal process complained of herein is deemed not to violate ICPG 704.2 and 704.3 (which is denied), then the adoption of ICPG 704.2 and 704.3 constituted agency actions, within the meaning of the Administrative Procedure Act, and which actions are likewise unlawful in that the adoption of regulations permitting the conduct complained of would be arbitrary and capricious, and an abuse of discretion, in that such procedures would be inconsistent with the statutory mandate, and would frustrate the underlying policy of providing fair and consistent substantive and procedural rights to all persons whose security clearance or access rights are revoked, as set forth in 50 U.S.C. § 435 *e seq.*, and the Executive Orders adopted in compliance therewith.

154.    Accordingly, to the extent that the September 2008 Revocation and/or the conduct of the sham review and appeal process and the November 7, 2011 ruling of the high-level appeal panel are deemed not to be in violation of the requirements of ICPG 704.2 and/or 704.3 (which is denied), the plaintiffs are entitled to and demand an order from this Court declaring the adoption of those regulations to be unlawful, and setting the said agency actions aside.

## COUNT FIVE

## (Federal Tort Claims Act)

155.    Plaintiffs incorporate the allegations contained in paragraphs 1 through 154 of this Complaint as if fully restated herein.

156.    As the designated entity to perform security clearance investigations for persons obtaining security clearances through DISCO, the FBI-SD functioned in a role analogous to a private investigator or a security contractor serving any industrial client.

157.    In its role as a private investigator or a security contractor, the FBI-SD owed a duty to those persons whose backgrounds would be investigated to conduct its investigations reasonably and fairly, and in accordance with the applicable law, including (without limitation) ICPG 704.2, 704.3, and the predecessor regulation, Director of Central Intelligence Directive 6/4.

158.    In conducting its investigation and preparing its report of the investigation (the September 15, 2008 Revocation letter), the FBI-SD breached its duty to conduct the said investigation reasonably and fairly, prepare its investigative report carefully, accurately and competently, and to otherwise fulfill its role as an investigator or a security contractor, in at least the following particulars:

    a.    The preparation by the FBI-SD staff of a Routing Document dated August 20, 2008 and a revocation letter dated September 15, 2008 that were replete with factual inaccuracies and outright baseless allegations that were not supported by the investigative file;

    b.    The issuance by the FBI-SD of the September 15, 2008 Revocation letter to Dr. McWeeney without the proper oversight necessary to detect and correct the wrongful information;

c.      The refusal by the FBI-SD to hold the September 2008 Revocation in abeyance pending further review of the file, even after being alerted by Dr. McWeeney that the information was wrong;

d.      The extension of the effects of the wrongful revocation actions regarding Dr. McWeeney personally, to his company CSM, and to all other properly cleared CSM employees as a whole;.

e.      The immediate discontinuation and blocking of all new contracts to Dr. McWeeney (over the strong objections of two Assistant Directors in the National Security Branch) and to CSM based on the wrongful September 2008 Revocation action against Dr. McWeeney;

f.      Restricting, Dr. McWeeney's access to FBI facilities, despite nearly 15 years of consecutive service;

g.      The seizure of classified documents and related computer equipment from Dr. McWeeney and CSM based on the wrongful September 2008 Revocation;

h.      The transmission of the wrongful information on Dr. McWeeney's clearance to DISCO and others;

i.      Failing to timely inform DISCO or any other governmental agencies that received the September 15, 2008 Revocation letter that the FBI-SD had retracted the false allegations in that letter that Dr. McWeeney had leaked classified information to the media and lied about it to the investigators, and that the FBI determined in 2009 to allow CSM and Dr. McWeeney to enter into new contracts with the FBI;

j.      Falsely or erroneously accusing Dr. McWeeney of having leaked classified material from an FBI Director's Report on Counterintelligence to the media, as erroneously

stated in the September 15, 2008 Revocation letter and in the transmittal document by which it was sent to DISCO, and possibly to other governmental agencies, when in fact there was no evidence in the investigative record that Dr. McWeeney even had access to the classified report, much less disclosed any classified information from that report to the media;

k.    Falsely or erroneously accusing Dr. McWeeney of having lied about allegedly having been authorized by a Deputy Director of the FBI to make the alleged leak of classified information to the media, as erroneously stated in the September 15, 2008 Revocation letter and in the transmittal document by which it was sent to DISCO, and possibly to other governmental agencies, when in fact there was no evidence in the investigative record that Dr. McWeeney ever made such a claim during the investigation;

l.    Falsely or erroneously accusing Dr. McWeeney of having changed very pertinent parts of his story over the course of the investigation, as erroneously stated in the September 15, 2008 Revocation letter and in the transmittal document by which it was sent to DISCO, and possibly other governmental agencies, when in fact there was no evidence in the investigative record that Dr. McWeeney actually had changed his story during the investigation, and the investigation file actually reflected that Dr. McWeeney's later statements "confirmed" his earlier ones;

m.    Falsely or erroneously accusing Dr. McWeeney of having lied in a polygraph examination on May 19, 2008, as erroneously stated in the September 15, 2008 Revocation letter and in the transmittal document by which it was sent to DISCO, and possibly to other governmental agencies, when in fact the investigative record

41

showed that Dr. McWeeney did not even take (much less fail) any polygraph examination on that date; and

n.     Falsely or erroneously suggesting that the September 2008 Revocation arose out of a counter-intelligence investigation, when in fact the counter-intelligence investigation was unrelated to the alleged bases for the September 2008 Revocation, and found no evidence of any wrongdoing on the part of Dr. McWeeney.

159.   In its capacity occupying the role of a private investigation or security contractor, the FBI-SD had a duty to correct any misstatements or erroneous information that it may have provided to its "clients" such as DISCO and/or any other governmental agencies in the course of an investigation.

160.   The FBI's actions constituted negligence or other wrongful actions for which a private party would be liable in tort, and are therefore actionable against the United States pursuant to the Federal Tort Claims Act, 28 USC § 2671 *et seq*. ("FTCA").

161.   The FBI's negligence or other wrongful action adversely affected Dr. McWeeney's personal and economic interests and caused him and CSM to suffer economic damages, as aforesaid.

162.   By letter dated September 10, 2010, Dr. McWeeney filed an administrative claim with the FBI under the FTCA.  The claim asked for damages in the amount of approximately $7.7 million, based on the FBI's negligence or other wrongful action that led to the FBI's improper failure to continue the contracts.  As noted in that FTCA Claim, the amount of plaintiffs' damages continue to increase as long as the effect of the shut-down of CSM continues to effectively prevent CSM or Dr. McWeeney from obtaining new contracts in the law enforcement, intelligence, and security arenas in which they have specialized.

163.   Dr. McWeeney made inquiries to the FBI about the status of his administrative claim at

various times, but was advised that the claim would not be decided until the FBI's final decision on the revocation proceeding. That linkage evidences the FBI's awareness that a successful review and appeal process was critical to its efforts to avoid liability for the consequences of its wrongful September 2008 Revocation.

164.    The FBI denied the administrative claim by letter of December 9, 2011. By letter of January 13, 2012 Dr. McWeeney requested the FBI to explain the bases for its FTCA ruling, but the FBI chose to treat the request as a request for reconsideration, and by letter of February 8, 2012 rendered a final denial of the administrative claim.

165.    Because this action is filed within six months of the final determination of the administrative claim by the FBI, it is timely.

166.    Accordingly, plaintiffs are entitled to and demand judgment in their favor and against defendant, the FBI, declaring the September 2008 Revocation to be null and void, and awarding plaintiffs damages, in an amount to be determined by this Court

### PRAYER FOR JURY TRIAL

Plaintiffs pray for trial by jury of all issues so triable herein.

WHEREFORE, plaintiffs, Thomas G. McWeeney and the Center for Strategic Management, pray that after due proceedings are had, there be judgment in favor of plaintiffs, Thomas G. McWeeney and the Center for Strategic Management, and against defendant the Federal Bureau of Investigation, in the following particulars:

a.    Declaring the September 2008 Revocation (including the September 15, 2008 Revocation letter and all subsequent iterations thereof), to be null and void, as having been rendered in violation of applicable law.

b.    Declaring the sham review and appeal process and the November 7, 2011 ruling by

43

the high-level appeal panel to be null and void, as having been rendered in violation of applicable law.

c.     Cumulatively and alternatively, declaring Intelligence Community Policy Guidance Statement 704.2 and/or 704.3 to be null and void, as having been adopted in violation of applicable law, and/or contrary to the United States Constitution.

d.     Awarding damages to plaintiffs, Thomas G. McWeeney and the Center for Strategic Management, as their respective interests may appear, and against defendant the Federal Bureau of Investigation, in an amount to be determined by this Honorable Court, for the damages to plaintiff Thomas G. McWeeney's liberty interest, and to both plaintiffs' property interests, by reason of the defendant's misconduct, as aforesaid.

e.     Awarding damages to plaintiffs, Thomas G. McWeeney, and the Center for Strategic Management, as their respective interests may appear, in an amount to be determined by this Honorable Court, for the defendant's violations of the Privacy Act and/or the Federal Tort Claims Act.

f.     Ordering the FBI-SD to give notice to DISCO and/or any other governmental agencies, correcting the false and erroneous accusations it has previously provided concerning the Thomas G. McWeeney and/or the Center for Strategic Management, including (without limitation) correction of any information provided with or about the September 15, 2008 Revocation letter.

g.     Awarding plaintiffs their reasonable costs (including attorneys fees) incurred in bringing this action.

h.      For all other or additional relief to which plaintiffs may be entitled by law, equity or

by the nature of this action

Respectfully submitted,

/s/Luis M. Nido (D.C. Bar No. 347542)
Luis M. Nido, PLLC
211 North Union St, Suite 100
Alexandria, VA 22314
Phone: 703-519-1260
Facsimile: 703-683-4707
Email: luismnido@aol.com

OF COUNSEL:

/s /Robert E. Barkley, Jr.
/s/  Mark Seyler
Barkley & Thompson, L.C.
1515 Poydras Street, Suite 2350
New Orleans, Louisiana 70112
Phone: 504-595-3350
Fax: 504-595-3355
E-mail: mseyler@barkleythompson.com
E-mail: rbarkley@barkleythompson.com